UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NA'IL CHARLES DOWNEY,<br><br>          Petitioner,<br><br>   v.<br><br>KEN CLARK; JERRY BROWN, Attorney General of the State of California,<br><br>          Respondents. | Civil No. 07-cv-0942-JLS (POR)<br><br>**PROPOSED FINDINGS OF FACT AND RECOMMENDATION THAT PETITION FOR WRIT OF HABEAS CORPUS BE DENIED** |

Petitioner Nai'il Charles Downey ("Petitioner"), a state prisoner proceeding *pro se*, has filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254, challenging his custody at California Substance Abuse Treatment Facility. Petitioner claims that he was convicted in violation of his federal rights to procedural due process and effective counsel. In accordance with Local Rule 72.1(d), this Court issues the following Proposed Findings of Fact and Recommendation for Disposition. For the reasons set forth below, the Court respectfully recommends that the Petition be DENIED.

**I. Background**

**A. Petitioner's Conviction**

Petitioner was one of eleven men charged with murder and attempted murder after a fight between rival street gangs at the 2003 Puerto Rican Festival in Mission Bay Park resulted in gunshots that killed one man and injured two others. Eight of the men charged in the case pled guilty to lesser crimes, and at trial a jury was unable to reach a verdict as to a ninth defendant.

1  Darrel James Tittle was convicted of voluntary manslaughter and attempted manslaughter. The jury
2  found that Petitioner had personally used the handgun which caused the death and injuries.
3  Petitioner was convicted of second degree murder and two counts of attempted murder. Petitioner
4  was sentenced to 65 years to life, plus an additional 16 years.

5  Under 28 U.S.C. § 2254(e)(1), factual determinations by a state court are presumed correct
6  unless a habeas petitioner rebuts that presumption by clear and convincing evidence. Petitioner has
7  not attempted to rebut the factual findings made in state court as to his crime, his arrest or his
8  conviction. The following facts, therefore, are taken verbatim from the California Court of Appeal's
9  opinion upon Petitioner's direct appeal of his conviction.

> [Petitioner] and [Darrell James] Tittle, stepbrothers by marriage, were members or associates of the Lincoln Park Bloods (Lincoln Park) criminal street gang on June 15, 2003, when the events pertinent to this case began unfolding. On that day, each met up with other Lincoln Park gang members and associates to travel to Mission Bay Park to attend the annual Puerto Rican Festival. When the group arrived at the beach in their traditional colors of red and green, they saw a large group of people associated with their rival criminal street gang, the Skyline Pirus or Crips (Skyline). The men from the Lincoln Park group, which included Tittle and [Petitioner], walked quickly toward the Skyline group. As they did so, several members donned gloves, and [Petitioner] and others put green bandanas over their faces.
>
> When the groups met face to face, they exchanged hostile, degrading and derogatory words, with Tittle telling the Skyline group, "we ain't trippin', if you ain't trippin'." When someone in the Skyline group said there were "no truces" and asked who Tittle was, Tittle declared, "I'm Knockout-D from Lincoln Park murda gang." When the Linoln Park group began chanting "murda gang," someone, probably Tittle, tossed a soda can at Skyline member Michael Canty, who immediately punched Tittle in the face, causing other Lincoln Park and Skyline members to exchange blows. Within seconds of this outbreak, [Petitioner] pulled out a .38 caliber revolver from his waistband and fired four to six shots at the Skyline group. Members of both groups fled after the shots were fired and police immediately arrived on the scene.
>
> While detaining people for questioning, the police saw several Black males drving in an Oldsmobile, which they later found abandoned in the beach parking lot. A search of the car revealed a Dupont jacket with a digital camera in the pocket on the back passenger seat and the firearm used in the shooting under that seat.
>
> As a result of the shooting, Skyline member Travis Thomas was hit in the upper chest by one bullet and died at a hospital within the hour. A second bullet passed through Canty's calf causing him great bodily injury and a third bullet hit Skyline member Greggoy Fulgham's foot.
>
> Because many of the witnesses to the altercation and shooting were friends, associates or members of the gangs involved, there was a tremendous amount of intimidation placed on them in the months following the shootings and the actual trial. Numerous witnesses were reluctant to talk to police or testify about the incident. [Petitioner] had even telephoned one witness, Angel Parrison, telling her she should leave town.
>
> At trial, the above evidence was presented as well as the testimony of a number of witnesses associated with Lincoln Park and Skyline, and two cooperating witnesses, Deandre Moore and Kenny Reed. The testimony revealed the group from Lincoln Park knew members of Skyline would likely be at Mission Bay Park that fateful day and there

would be a fight if the members of Skyline posed any problems as they had in 2002 at the Puerto Rican festival, which had also erupted in a fight and shooting between the two rival gangs. In addition to independent witnesses giving accounts of how the Lincoln Park group menacingly advanced toward the Skyline group at Mission Bay Park and giving physical descriptions of the shooter as having long hair pulled back in a ponytail, wearing a Dupont jacket with a green bandana over his face, being about 5'10" to 5'11" tall and thin, the jury received video and photographic evidence taken by Skyline member Allen Reddick at the beach that day showing the approaching gang's actions, and included stills of the 11 persons originally charged in this case. The physical descriptions of the shooter matched [Petitioner]'s physical build.

In addition, both Moore and Reed, who had originally been charged with the same crimes as [Petitioner] and Tittle, and had pled guilty to lesser charges to avoid prison terms, testified as accomplices as a matter of law. Each had been to the Bay Vista Apartments with [Petitioner], known as "Li'l Knockout," and other Skyline members before heading for the beach in several carloads via a liquor store, where Tittle, Silvels and additional Lincoln Park members joined the caravan. Before leaving the apartments, Reed heard the group talk about Skyline being at the beach and [Petitioner] ask "who was going to carry the gun or whatever." Both Reed and Moore described [Petitioner] as wearing a Dupont jacket or red "race car jacket" that day and said he had a digital camera with him earlier in the day.

Moore, who rode to the beach in an Oldsmobile with [Petitioner] and others, stated they parked the car near the roller coaster and walked across the street toward Bonita Cove after meeting with Reed and other Lincoln Park member who had arrived at the beach. When the group saw people from Skyline, gang signs and yelling began between the two rivals. Although they saw [Petitioner] pull a green handkerchief out of a pocket, saw someone in the Skyline group punch Tittle, and heard about six shots before running back toward the parking lot where he was detained by police, Moore did not see a gun or who was shooting it that day.

Although [Petitioner] had threatened Moore about testifying in this case, Moore identified [Petitioner] in court as the person wearing the Dupont jacket visible in one of the video stills, noted [Petitioner] had cut his hair two days after the shooting, and said [Petitioner] had merely smiled when asked if he had anything to do with the shooting.

Reed claimed he did not see the fight with Skyline take place, but only saw the two groups of people "running at each other." According to Reed he bent down to tie his shoe and when he got up he heard gunshots. He froze when he saw the gun and saw [Petitioner] firing it in "their direction." When Reed ran back across the street to the parking lot, he saw [Petitioner] run to the Oldsmobile and return from the car without the Dupont jacket. When Reed later talked with [Petitioner] about the shooting, [Petitioner] told him he was the shooter and "it wasn't supposed to happen like that." Reed told others he had been close to the shooting and [Petitioner] was the shooter. Reed was impeached with many inconsistent statements he had made during the investigation about whether he had seen the shooting or knew who the shooter was.

The jury further received evidence that, besides [Petitioner], an older Lincoln Park member, Chantell Wilson, also carried a gun to the beach that day, and that [Petitioner] had essentially admitted afterwards to various Lincoln Park members and associates other than Reed that he was the "shooter."

Parrison also unwillingly testified regarding her threats from [Petitioner] about her testifying and was impeached by numerous statements she had made to the police during the investigation when she denied knowing anything about the shooting at trial. In those earlier statements, she had told police [Petitioner] and others had planned the encounter with Skyline before leaving the Bay Vista Apartments, with [Petitioner] to carry the gun, and that afterwards, at her apartment, many of the [gang] members met, including [Petitioner], and everyone talked about [Petitioner] being the one who shot "the kid" at the beach. Parrison also told the police [Petitioner] had cut his hair the day after the shooting. She thought the person in the Dupont jacket in the photograph stills could have been [Petitioner].

In addition to the above, testimony of numerous police officers regarding the investigation and pretrial statements of other witnesses, who later changed their testimony at trial, as well as a gang expert testifying about the history of violence between Lincoln Park and Skyline and the significance of gang colors, monikers, signs and language were presented. The expert opined violence and shootings would be expected when large groups of these two antagonistic gangs came in [contact] while in full gang colors. The expert and another police officer also discussed the gang songs on various CDs and letts found in the possession of Lincoln Park gang members, including Tittle and [Petitioner], which contained words and lyrics about murdering Skyline members and warning about "snitches." The expert further discussed the "code of silence" among gang members and the practices of switching clothing around so as not to be identified by police.

Tittle presented several witnesses in his defense to show he did not fight back after Canty swung at him, he was angry with [Petitioner] and he thought the shooting was a "stupid thing" to do. He also relied on codefendant Silvel's testimony that he (Tittle) had made it clear to the Skyline group that he did not want any problems and the Lincoln Park group was only there to pick up girls at the festival. [Petitioner]'s mother and an investigator testified in [Petitioner]'s defense, hoping to show [Petitioner] had worn a striped sweater that day and was not the shooter as depicted in the video still photographs shown the jury.

After considering all the evidence, arguments and instructions, the jury convicted Tittle and [Petitioner] of various offenses stemming from the shootings, with [Petitioner] being found to have been the person who fired the gun that killed Thomas and wounded Canty and Fulgham.

**B.    Petitioner's Direct Appeal and Collateral Attack**

Petitioner appealed his conviction, based upon the same four claims that he raises in the Petition. (Lodgment 3.) The California Court of Appeal, Fourth Appellate District Court, Division One affirmed Petitioner's conviction, rejecting all of the claims raised in his appeal. (Lodgment 5.)

Petitioner next filed a Petition for Review in the California Supreme Court, based upon the same claims. (Lodgment 6.) The California Supreme Court denied that petition on August 23, 2006. (Lodgment 7.)

**C.    Petition for Federal Habeas Corpus Relief**

The instant petition for a federal writ of habeas corpus was filed with this Court on May 23, 2007, and is Document 1 on this civil docket. The Petition seeks relief on the grounds that: (1) Petitioner's Fourteenth Amendment right to due process was violated when the jury was not instructed that witness Angel Parrison may have been an accomplice to the charged crimes, (2) there was insufficient evidence presented at trial of the specific intent that is required for murder convictions, (3) the trial court failed to instruct the jury that convictions for attempted murder require an intent to kill each victim, and (4) Petitioner received ineffective assistance of counsel

when counsel failed to object to the prosecutor's explanation of concurrent intent to the jury.

An Answer to the petition was filed on August 3, 2007 by the Attorney General of the State of California. The Answer argues that Grounds 1 and 3, which seek to challenge the jury instructions given at Petitioner's trial, do not raise a federal question for the Court to review. The Answer further contends, in response to Ground 2 of the Petition, that the last reasoned decision by a state court in Petitioner's case correctly applied clearly established federal law to Petitioner's claim that he was convicted on insufficient evidence. In response to Ground 4 of the Petition, Respondents asserts that the last reasoned decision correctly applied clearly established federal law to Petitioner's claim of ineffective assistance of counsel.

Petitioner did not file a traverse to the Answer, despite an Order allowing him to do so by September 5, 2007. (Doc. 4.)

## II. Standard of Review

Title 28 U.S.C. section 2254(a), allows for federal review of "the judgment of a State court only on the ground that [the habeas petitioner] is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a) (2007). The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") applies to habeas corpus petitions filed after 1996. Lindh v. Murphy, 521 U.S. 320 (1997). The current petition was filed in 2006, and is governed by the AEDPA. As amended by the AEDPA, 28 U.S.C. section 2254(d) reads:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

In addition to the AEDPA's limitation of federal court review to "violation[s] of the Constitution of laws or treaties of the United States," 28 U.S.C. § 2254(a), the United States Supreme Court has also instructed that "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." Estelle v. McGuire, 502 U.S. 62, 67-8 (1991).

1  Federal habeas review is available to assess the constitutionality of a judgment of a state
2 court. Where there is no reasoned decision from the state's highest court to review, a federal court
3 "looks through" the silent state court decision to the "last reasoned opinion" issued in the state's
4 courts. Ylst v. Nunnemaker, 501 U.S. 797, 803, 805 (1991). In Petitioner's case, the California
5 Supreme Court denied Petitioner's state petition for writ of habeas corpus without comment.
6 Therefore, in reviewing Petitioner's claims, this Court looks to the reasoned opinion by the
7 California Court of Appeal, Fourth Appellate District, Division One, dated May 5, 2006 (filed with
8 this Court as Lodgment 5) - which denied Petitioner's direct appeal. Ylst, 501 U.S. at 801-06.

### III. Discussion

10  The instant petition raises four grounds for federal habeas relief. Doc. 1 at 6-9. Each of
11 these grounds was presented to the California Court of Appeal upon direct appeal. (Lodgment 3.)
12 Ground 1 of the Petition seeks relief on the basis of Petitioner's claim of prejudicial error from a
13 lack of jury instruction in response to the testimony of witness Angel Parrison. Ground 2 of the
14 Petition claims that there was insufficient evidence at trial of the specific intent required for the
15 attempted murder convictions. Ground 3 seeks relief because the jury was not instructed that
16 convictions for attempted murder require an intent to kill each victim. Ground 4 of the Petitioner is
17 a claim of ineffective assistance of counsel, premised on the argument that counsel unreasonably
18 failed to object to the prosecutor's explanation to the jury of concurrent intent.

19 **A.  Ground One**

20  Petitioner's first ground for relief is a claim that the trial court failed to instruct the jury that
21 they should determine whether Angel Parrison was an accomplice and, if they determined that she
22 was, to treat her testimony accordingly. Petitioner claims that if the trial court had issued such an
23 instruction, the jury would have found Parrison to be an accomplice and would have discredited her
24 testimony. (Doc. 1 at 6.)

25  In Estelle v. McGuire, the Supreme Court examined the constitutionality of jury instructions
26 and narrowed the inquiry of federal review to the question of "whether the ailing instruction by itself
27 so infected the entire trial that the resulting conviction violate[d] due process." 502 U.S. 62, 72
28 (1991) (quoting Cupp v. Naughten, 414 U.S. 141 (1973)). The Supreme Court also determined that

1  a disputed jury instruction "must be considered in the context of the instructions as a whole and the
2  trial record." Id.  The standard for federal courts reviewing jury instructions in a state criminal
3  prosecution is whether the jury instructions in a case, read as a whole and in light of the entire
4  record, failed to instruct the jury of an element of a commitment offense.  The Supreme Court's
5  prejudice standard for evaluating trial error on collateral review, as set forth in Brecht v.
6  Abrahamson, is also applicable.  507 U.S. 619 (1993)

7        In examining this claim upon Petitioner's direct appeal, the Court of Appeal held that the
8  trial court made no error in failing to *sua sponte* instruct the jury to consider whether Parrison's
9  testimony could be trusted or whether she may be an accomplice.  The Court of Appeal found that
10 "there was no evidence to support a finding that [Parrison] was an accomplice." (Lodgment 5 at 26.)
11 This was because Parrison "only heard about the shooting and had not seen it.  In addition the video
12 and still photographs showing the conflict between Lincoln Park and Skyline that day revealed there
13 were no women present during the confrontation." (Id.)  The Court of Appeal rejected Petitioner's
14 argument because Parrison's mere knowledge that Petitioner was armed on the day of the murder,
15 did not make her an accomplice to murder or attempted murder.  (Id. at 6.)

16       The Court of Appeal's decision that the trial court was not obligated as a matter of law to
17 provide a jury instruction for a determination of Parrison's status as an accomplice was not contrary
18 to clearly established federal law.  The Court of Appeal's analysis and determination that Parrison
19 was indeed not an accomplice to murder or attempted murder under California law, leads to the
20 conclusion that the trial court's omission of a jury instruction to that effect did not so infect the
21 entire trial so as to violate Petitioner's right to due process. Estelle v. McGuire, 502 U.S. at 72
22 (1991).  While the Court of Appeal found no error in the omission of a jury instruction, the Court of
23 Appeal's decision correctly resolved whether the lack of an instruction "had substantial and
24 injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S.
25 619, 637 (1993).  Petitioner is not entitled to federal habeas relief on the claim posed by Ground
26 One of the Petition.

27 **B.  Ground Two**

28       Ground 2 of the Petition claims that there was insufficient evidence of the specific intent

1  required for attempted murder with which to convict Petitioner. (Doc. 1 at 7.) Petitioner asserts the
2  evidence was insufficient for the jury to find that he intended to kill the victims who were wounded
3  in the shooting. In the Answer, Respondent contends that the Court of Appeal properly applied the
4  standard of review for claims of insufficient evidence, as set forth by the U.S. Supreme Court in
5  Jackson v. Virginia, 443 U.S. 307, 318 (1979).

6        The federal constitutional right to due process "protects the accused against conviction
7  except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with
8  which he is charged." In re Winship, 397 U.S. 358, 364 (1970). When a habeas petitioner claims
9  that there was insufficient evidence produced at trial to support a conviction, a federal court
10 determines whether "after viewing the evidence in the light most favorable to the prosecution, any
11 rational trier of fact could have found the essential elements of the crime beyond a reasonable
12 doubt." Jackson v. Virginia, 443 U.S. 301, 319 (1979). Deference is provided to the trier of facts'
13 weighing of the evidence by reviewing "*all of the evidence* . . . in the light most favorable to the
14 prosecution." Id. (emphasis in the original). With the additional layer of deference established by
15 the AEDPA, Petitioner must demonstrate that the California Court of Appeal contradicted clearly-
16 established Supreme Court precedent by rejecting Petitioner's claim because no rational trier of fact
17 could have found Petitioner guilty beyond a reasonable doubt. Cf. Juan H. v. Allen, 408 F.3d 1262,
18 1274-5 (9th Cir. 2005).

19       In considering Petitioner's direct appeal, the Court of Appeal did apply the clearly-
20 established federal standard from Jackson v. Virginia, as quoted by the Supreme Court of California
21 in People v. Rich, 45 Cal.3d 1036, 1081 (1988). (Lodgment 5 at 10.) Using that standard, the Court
22 of Appeal examined Petitioner's claim that there was insufficient evidence at his trial to support a
23 finding of specific intent to kill the wounded victims. The Court of Appeal cited the California
24 Supreme Court in finding that, to be guilty of attempted murder, Petitioner had to have an intent of
25 express malice toward each victim, and that this required a showing that Petitioner either desired the
26 result or knew that the result would occur. (Lodgment 5 at 11) (quoting People v. Smith, 37 Cal.4th
27 733, 739 (2005).

28       The Court of Appeal went on to hold that "firing a gun toward a victim at close range 'in a

1  manner that could have inflicted a mortal wound had it been on target is sufficient to support an
2  inference of intent to kill.'" (Id. at 12.) (quoting People v. Lashley, 1 Cal. App.4th 938, 945 (Cal. Ct.
3  App., 2d Dist., 1991.)  The Court of Appeal considered that the evidence at Petitioner's trial showed
4  that Petitioner armed himself prior to going to Mission Bay Park, with the understanding that the
5  Skyline gang would be there and he would use the gun if there was trouble.  When the fighting
6  between the two gangs began, Petitioner pulled out the gun and shot at Skyline members at close
7  range.  The Court of Appeal found three alternative ways that the jury could have found that
8  Petitioner had the requisite intent to kill the injured victims.

9    First, the Court of Appeal found that the jury could have reasonably inferred from the
10 evidence that Petitioner shot into the group with the intent to kill each person who he could have hit,
11 or that Petitioner had knowledge that shooting in the group would result in deaths of Skyline
12 members.  The court acknowledged that "the evidence was conflicting as to whether [Petitioner]
13 pointed the gun toward the ground when he shot." (Lodgment 5 at 13.)  However, "there was
14 testimony Skyline members began ducking and hitting the ground to get out of the way when they
15 heard shots being fired.  The jury could have reasonably inferred from such evidence that
16 [Petitioner] was pointing the gun down to hit some Skyline members who had reacted in such a
17 manner."  (Id.)

18   Second, the Court of Appeal found express malice based on Angel Parrison's testimony that
19 prior to going to the park Petitioner had armed himself knowing that Skyline gang members would
20 be there.  The jury could have found that Petitioner went to the park armed intending for a fight to be
21 provoked so he could kill Skyline members.  This, the Court of Appeal found, provided substantial
22 evidence of specific intent as to any Skyline member, including the victims who were in fact shot.
23 (Lodgment 5 at 13-14.)

24   Third, the Court of Appeal held that California case law supports a "kill zone" theory of
25 transferred intent.  Under this theory, the jury could have found beyond a reasonable doubt that
26 Petitioner intended to kill Canty, who had punched Tittle, and that he shot at the other two victims
27 because they were in the "kill zone." (Lodgment 5 at 14.)

28   In concluding that there was substantial evidence to support the jury's finding that Petitioner

attempted to murder the victims who were wounded in the shooting, the Court of Appeal reasonably applied clearly established federal law.  The Court of Appeal properly determined whether "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 301, 319 (1979).

**C.  Ground Three**

In Ground 3, Petitioner asserts that the trial court failed to instruct the jury that to find Petitioner guilty of the attempted murder charges, they must find that Petitioner intended to kill each of the shooting victims.  (Doc 1 at 8.)  Petitioner claims that the lack of an instruction, combined with the prosecutor's closing argument about transferred intent, resulted in his being unconstitutionally convicted.

As stated above, the constitutionality of jury instructions is assessed based on "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violate[d] due process."  Estelle v. McGuire, 502 U.S. at 72.  The standard for federal courts reviewing jury instructions in a state criminal prosecution is "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution."  Id. (quotations and citations omitted).

Petitioner raised this same claim in his direct appeal.  The Court of Appeal found that the court had properly instructed the jury on the necessary elements of attempted murder.  (Lodgment 5 at 28.)  The court made it clear to the jurors that the elements of attempted murder needed to be separately found in regards to each victim in order to convict Petitioner of both counts of attempted murder.  (Id. at 31.)  The Court of Appeal found that "[t]he instructions of attempted murder were correct and unambiguous."  (Id.)  Despite the fact that Petitioner's counsel did not request clarifying instructions, the Court of Appeal proceeded to examine whether there had been any prejudicial error in the absence of further instructions when the prosecutor "inartfully" argued a theory of concurrent intent in his closing argument.  The court concluded that "there is no reasonable probability the jury misapplied those instructions and found [Petitioner] guilty of attempted murder without the requisite specific intent to kill as to each victim."  (Id. at 33.)

- 10 -

07cv942

The Court of Appeal applied the standard set forth in Estelle v. McGuire and found no reasonable probability that the jury misapplied the trial court's instructions on the elements of attempted murder. The Court of Appeal's decision as to this claim was not an unreasonable application of clearly established federal law.

**D. Ground Four**

In Ground 4 of the Petition, Petitioner claims ineffective assistance of counsel, based on trial counsel's failure to object to the prosecutor's explanation of concurrent intent, presented to the jury in the prosecution's closing argument. (Doc. 1 at 9.)

To prevail on a claim of ineffective assistance of counsel, a federal habeas petitioner must meet two requirements. First, "the defendant must show that counsel's performance was deficient." Strickland v. Washington, 466 U.S. 668, 687 (1984). "Deficient performance is performance which is objectively unreasonable under prevailing professional norms." Hughes v. Borg, 898 F.2d 695, 702 (9th Cir., 1990). Second, "the defendant must show that the deficient performance prejudiced the defense." Strickland v. Washington, 466 U.S. at 687. To determine whether Petitioner's claim meets these two requirements, the Court undertakes an examination of the trial record and of counsel's performance, but "judicial scrutiny of counsel's performance must be highly deferential." Id.. 466 U.S. at 689.

Upon Petitioner's direct appeal, the Court of Appeal applied the clearly-established federal standard for claims of ineffective assistance of counsel, as it was restated by the Supreme Court of California in People v. Benavides, 35 Cal.4th 69 (2005). (Lodgment 5 at 44.) The court indulged the strong presumption that Petitioner's trial counsel engaged in reasonable conduct, and rejected Petitioner's claim on the lack of prejudice resulting from the allegedly deficient performance. The Court of Appeal found that the trial court's issuance of California Jury Instruction 8.66.1, which explains concurrent intent, left no reasonable probability that the jury would have rendered a more favorable verdict if counsel had objected to the prosecutor's closing argument. (Lodgement 5 at 45.)

The prosecutor told the jury that she did "not need to prove the shooter killed or attempted to kill a particular person in this case. A person who primarily intends to kill one person may also concurrently intend to kill other persons within a particular zone of risk." (Lodgment 2, Volume 16

1  at 2348.) California Jury Instruction 8.66.1, which was given by the trial court, explains attempted
2  murder by concurrent intent as occurring "when the nature and scope of the attack, while directed at
3  a primary victim, are such that it is reasonable to infer the perpetrator intended to kill the primary
4  victim by killing everyone in that victim's vicinity."

5        The California Court of Appeal applied the clearly established federal standard in assessing
6  Petitioner's claim.  By applying that standard, the Court of Appeal found that Petitioner can not
7  meet his burden of demonstrating that defense counsel's failure to object during the prosecution's
8  closing argument - if that failure was indeed objectively unreasonable - prejudiced the defense.  The
9  Court of Appeal's decision was neither contrary to, nor an unreasonable application of, the clearly-
10 established <u>Strickland</u> standard.

11 **IV. Conclusion**

12       After thorough review of the record in this matter and based on the foregoing analysis, this
13 Court recommends that the Petition for Writ of Habeas Corpus be DENIED.  This Proposed
14 Findings of Fact and Recommendation for Disposition of the undersigned Magistrate Judge is
15 submitted to the United States District Judge assigned to this case, the Honorable Janis L.
16 Sammartino, pursuant to the provisions of 28 U.S.C. § 636(b)(1) (2007) and Local Rule 72.1(d).

17       IT IS HEREBY ORDERED that **no later than <u>October 17, 2008</u>**, any party may file and
18 serve written objections with the Court and serve a copy on all parties.  The document should be
19 captioned "Objections to Report and Recommendation."

20       IT IS FURTHER ORDERED that any reply to the objections shall be filed and served no
21 later than ten days after being served with the objections.  The parties are advised that failure to file
22 objections within the specified time may waive the right to raise those objections on appeal of the
23 Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153, 1156-57 (9th Cir. 1991).

24 DATED: September 24, 2008

25
26                               LOUISA S PORTER
                              United States Magistrate Judge
27
28 cc:       The Honorable Janis L. Sammartino
          All parties